UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES METZ, | : | Case No. 3:11-cv-391 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED; AND
(2) JUDGMENT IS ENTERED IN FAVOR OF PLAINTIFF
AWARDING BENEFITS**

This is a Social Security disability benefits appeal. At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to a period of disability, disability insurance benefits ("DIB") and

Supplemental Security Income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 24)

(ALJ's decision)).

## I.

Plaintiff initially filed a claim for DIB on February 19, 2002, alleging disability

since October 25, 2000. (Tr. 65). This claim was denied via a written ALJ decision dated

July 29, 2005, which found that Plaintiff could perform "light work." (Tr. 62-76).

Plaintiff then filed claims for a period of disability, DIB and SSI on December 14, 2007,

alleging disability since December 31, 2003. (Tr. 113). On May 21, 2008, Plaintiff

amended his application to reflect an onset date of July 30, 2005. (Tr. 116-119). Plaintiff alleges disability due to cervical and lumbar degenerative disc disease as well as depression. (Tr. 40-42).[1]

Plaintiff's claim was denied initially and on reconsideration. (Tr. 77-78). Plaintiff timely filed a request for a hearing before an ALJ. (Tr. 31-33). A hearing was held on April 29, 2010, where Plaintiff appeared with his attorney and testified. (Tr. 35). The ALJ denied the claims in a decision dated September 3, 2010. (Tr. 20). The ALJ found that given Plaintiff's vocational profile, and a RFC for a range of medium work,[2] Plaintiff could perform a significant number of jobs in the economy. (Tr. 18). Plaintiff requested review of the ALJ's decision by the Appeals Council. (Tr. 7-9). The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. (Tr. 1-4). Plaintiff then commenced this action in this Court for judicial review.

Plaintiff was 49 years old at the time of his hearing before the ALJ, and thus considered a "younger person" under the laws of Social Security.[3] (Tr. 22). Plaintiff has a high school education. (*Id.*) He worked in the past primarily as a machinist and truck

---

[1]     Plaintiff also complains of various symptoms related to these alleged impairments, including pain in his hips, pain and numbness in his right leg which lead him to use a cane, muscle spasms, weakness, numbness in his right arm, arthritis, an antalgic gait, suicidal ideation, self-mutilation, and a lack of concentration. (*See* Tr. 39-42, 45-48, 50, 53, 56).

[2]     A claimant's residual functional capacity ("RFC") is an assessment of "the most [he] can still do despite [his] limitations." 20 CFR § 416.945(a)(1). The regulations describe that a claimant may have both "exertional" and "nonexertional" limitations on the ability to work. *Id.* at § 404.1569a(a).

[3]     20 C.F.R. §§ 404.1563, 416.963.

repairer.  (Tr. 39, 22).  Plaintiff last worked as a truck repairer in October of 2000, and the ALJ found that Plaintiff could not return to his past work.  (Tr. 66, 22).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1.  The claimant meets the disability insured status requirements of the Social Security Act through December 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since July 30, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: mild lumbar degenerative disc disease and depression (20 CFR 404.1529(c) and 416.92(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.920(d), 416.925).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) subject to the following limitations: simple, repetitive tasks.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 419.965).

7.  The claimant was born October 12, 1960 and was 44 years old, which is defined as younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined by the Social Security Act, from July 30, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-24).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI.  (Tr. 24).

On appeal, Plaintiff argues that: (1) the ALJ's finding that Plaintiff can physically withstand medium work lacks evidentiary support and directly conflicts with the *Drummond* ruling; (2) the ALJ fails to apply the correct legal framework to the opinions of Plaintiff's treating physicians; (3) the ALJ substitutes her own lay reading of a lumbar MRI report for the opinions of medical professionals and record medical evidence; (4) the ALJ fails to account for Plaintiff's cervical degenerative disc disease; (5) the limitation to "simple, repetitive tasks" fails to account for Plaintiff's many severe mental health limitations; and (6) the ALJ's decision is not supported by substantial evidence.  The Court will address each argument in turn.

-4-

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**A.**

The record reflects that:

**1.    Plaintiff's testimony**

At his hearing, Plaintiff described experiencing severe lower back pain that radiates into both hips and down his right leg to his heel.  (Tr. 50).  He testified that this pain is constant and becomes significantly worse when he stands or sits for more than two hours at a time, requiring him to lie down at two hour intervals throughout the day.  (Tr. 44, 47, 50).  Plaintiff also reported numbness in his right leg which leads him to use a cane.  (Tr. 51).  His back pain is so severe that even with medication, his pain level remains at a 7-8 out of 10.  *Id*.  Plaintiff stated that light chores, such as dishes, exacerbate his back pain to such a degree that he contemplates suicide.  (Tr. 45-47).  Plaintiff asserts that he is only able to stand for ten minutes, walk across the street, and sit for two hours before he must lie down and rest.  (Tr. 44).

Plaintiff also reported neck pain, as well as weakness and numbness in his right arm and hand.  (Tr. 45-54).  The use of his right hand is further limited by the loss of his right index finger and by a non-functioning joint in his right middle finger.  (Tr. 41).  He additionally reported experiencing extreme depression since he lost the ability to work, resulting in suicide attempts and self-mutilation.  (Tr. 40, 45-47).

Plaintiff has no friends with whom he visits, but his mother visits in order to ensure that daily chores are completed by Plaintiff's children.  (Tr. 55).  He described

concentration so poor that it makes hard for him to read, or to maintain interest in a television show.  *Id*.

## 2.  Medical evidence of record

The earliest medical evidence in the record are a lumbar x-ray and an MRI from October of 2000, which show mild degenerative changes in Plaintiff's lumbar spine at L5-S1 and L4-L5.  (Tr. 456-458).  An MRI report from October 29, 2001, also identified disc dessication and a disc herniation at L4-L5 and L5-S1.  (Tr. 192-193).  A more recent lumbar x-ray from February 20, 2009 indicated only generically mild degenerative changes.  (Tr. 394).  However, an MRI performed on July 28, 2009, revealed mild disc bulging at L4-L5 with minimal thecal sac compression,[4] along with similar bulging at L5-S1 with contact at the S1 nerve roots.  (Tr. 398).

On January 29, 2008, Dr. Reddy, Plaintiff's pain management doctor, indicated that a physical examination of Plaintiff revealed an antalgic, unsteady gait; a decreased range of motion in his neck and lower back; spasmodic, painful neck motions; and pain, numbness, and tingling radiating from Plaintiff's lower back into his right leg, including his calf and foot.  (Tr. 233).  Dr. Reddy's treatment notes from 2008-2010 consistently note ongoing numbness, tingling, weakness, muscle spasms, pain, and an antalgic gait in Plaintiff's back, right hip and right leg.  (Tr. 298-335, 340-345, 347-357, 399-450).

---

[4]  The thecal sac is an enclosed cerebral spinal fluid-filled sac located at the lumbar spine, which is meant to protect the spinal nerve roots.  Compression of these nerve roots can cause a variety of symptoms, including: pain, tingling, burning, specific muscle weakness, and bowel and bladder incontinence.

Plaintiff presented to Miami Valley Hospital in June of 2005 for suicidal ideation and major depression, occasioned by his pain and his inability to work.  (Tr. 205-220). On January 22, 2007, Dr. Mark Reynolds performed a psychiatric assessment of Plaintiff which resulted in a diagnosis of major depression and dysthymia.[5]  (Tr. 222-225).  Dr. Reynolds assigned Plaintiff a GAF score of 42,[6] noting serious symptoms and serious impairment in social functioning.  (Tr. 224).

William J. Riley, Ph.D. treated Plaintiff's depression from November of 2005 through September of 2008.  (Tr. 300-335, 376-377).  Dr. Riley's treatment notes reflect that Plaintiff's depression was tied to his pain, with higher levels occasioned by increased activity leading to increased depression.  (Tr. 263-265).  Dr. Riley also recorded Plaintiff's observation that "everything I do leads to pain," and noted the presence of suicidal ideation.  (Tr. 272).  In terms of clinical signs and findings, Dr. Riley frequently noted that Plaintiff exhibited a blunted affect and depressed mood.  (Tr. 274-276, 279). At his initial assessment with Dr. Riley, Plaintiff was disheveled, his mood was depressed

---

[5]  Dysthymia is a serious state of chronic depression which persists for at least two years, and lasts longer than, but is not as acute as, a major depressive episode.  A dysthymic patient may develop "double depression," or the concurrent existence of both dysthymia and a major depressive episode.  Double depression is commonly treatment-resistant.

[6]  The Global Assessment of Functioning is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.  A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

and angry, his affect was restricted, his concentration and memory were impaired, his behavior was guarded, and his motor speed was slow.  (Tr. 286).  Dr. Riley performed a Million Behavioral Medicine Diagnostic Test[7] in November of 2005 which revealed high levels of depression and anxiety, resulting in feelings of frustration and an inability to cope, as well as extreme levels of cognitive impairment, memory loss, and/or confusion. (Tr. 288-297).

In January of 2009, Plaintiff was assessed for psychiatric treatment at Ben El Child.  (Tr. 361-364).  The assessment reflected Plaintiff's severe pain and self-mutilation.  (Tr. 364).  Treatment notes indicate that even when Plaintiff is not actively suicidal or self-mutilating, he still "would rather not wake up," and isolates himself in his home because of his "severe anhedonia."[8]  (Tr. 381-392, 466, 483).  Plaintiff continues, however, to self-mutilate.  (Tr. 392, 459-464, 517).

### 3.  Non-treating source opinions

Joan Williams, Ph.D. examined the evidence at the request of the state agency and on April 18, 2008 noted that, pursuant to *Drummond*, she was adopting the MRFC[9] from the ALJ decision dated July 29, 2005.  (Tr. 237).  She diagnosed Plaintiff with

---

[7]  The Million Behavioral Medicine Diagnostic test provides an assessment of psychosocial factors that may support or interfere with a chronically ill patient's course of medical treatment.

[8]  Anhedonia is a person's inability to experience pleasure from activities once thought enjoyable.

[9]  "MRFC" is an RFC which limits its consideration to mental capabilities.

depression/dysthymia and opined that he had mild restriction of his daily activities and difficulty maintaining social functioning. (Tr. 242, 249). She also opined that Plaintiff has moderate difficulties maintaining concentration, persistence, or pace. (Tr. 249). Dr. Williams explains that she simply deferred to the prior ALJ decision because he considered a wide range of psychiatric opinions in reaching his conclusions. (Tr. 253). Another reviewer affirmed Dr. Williams' assessment without further discussion on July 4, 2008. (Tr. 336).

State agency reviewer Dr. Gary Demuth offered an opinion regarding Plaintiff's physical functioning on May 9, 2008. (Tr. 254-261). Like Dr. Williams, he too adopted the RFC from the prior ALJ decision, finding that claimant is limited to light work with only the occasional performance of work-related postures or bilateral overhead reaching and certain environmental restrictions. (Tr. 255-258). A state agency reviewer affirmed Dr. Demuth's assessment on July 21, 2008. (Tr. 337).

### 4. Treating source opinions

In response to a questionnaire from Social Security, on December 27, 2007, Dr. Reddy opined that Plaintiff could sit for only 2 hours without a break, stand or walk for only 15 minutes, not stoop or lift, and that he could not function independently. (Tr. 230). A similar questionnaire was sent to treating psychologist Dr. William Riley, to which he responded on January 18, 2008. (Tr. 229-231). Dr. Riley opined that Plaintiff exhibits poor concentration, slow pace, confusion, little frustration tolerance, and low motivation.

(Tr. 230). He noted that Plaintiff decompensates as his pain level fluctuates and that he can barely tolerate routine stressors without becoming overwhelmed. (Tr. 230-231). Ultimately, Dr. Riley states, "I believe [Plaintiff is] unable to tolerate workplace stressors of any kind until pain levels decrease." (Tr. 231).

In a dictation from January 29, 2008, Plaintiff's pain management doctor, Dr. Reddy, noted that due to Plaintiff's depression and pain, "[i]t is my medical opinion that the patient is not employable at this time and more than likely will not be for at least 2 to 24 months." (Tr. 233). Dr. Reddy also wrote a note on November 25, 2008 indicating that Plaintiff remained unable to work due to his chronic pain condition. (Tr. 346).

To supplement the more general claims of un-employability cited above, Dr. Reddy completed a comprehensive physical capacities assessment on March 30, 2010. (Tr. 451-455). In that assessment, Dr. Reddy opined that Plaintiff could not meet the specific physical demands of medium, light, or sedentary work on a sustained basis. (Tr. 455). He further opined that Plaintiff can only lift 5 pounds occasionally and 2 pounds frequently. (Tr. 452). Additionally, he opined that Plaintiff can stand for less than 2 hours in a given 8-hour period, in less than 15-minute increments, and that he can sit for 2 hours in 30-minute increments. *Id.* Dr. Reddy also identified specific postural and environmental limitations and identified the basis for his opinions. (Tr. 451-455).

On March 17, 2010, Dr. Jennifer Shoenfelt, a board-certified psychiatrist who treated Plaintiff through Ben El Child, completed a series of interrogatories. (Tr. 366-

382). Dr. Shoenfelt explained that depression can worsen physical pain and that physical pain can exacerbate depression. (Tr. 368). Dr. Shoenfelt then opined that Plaintiff would likely have difficulty maintaining attendance, responding appropriately to supervision, meeting basic work standards for work productivity and accuracy, completing a normal work day and work week, and sustaining an ordinary routine without special supervision. (Tr. 369-373). Dr. Shoenfelt further noted that Plaintiff's depressive symptoms were characterized by a pervasive lack of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 379). Ultimately, Dr. Shoenfelt opined that Plaintiff has marked restriction of his activities of daily living and marked deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner. (Tr. 382). She further opined that Plaintiff is marked to extremely limited in his social functioning. *Id*.

## B.

First, Plaintiff alleges that the ALJ's finding that he can physically withstand medium work lacks any evidentiary support and directly conflicts with the *Drummond* ruling, because the prior ALJ found that Plaintiff was capable of only light work. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).

In *Drummond*, the Sixth Circuit held that Social Security claimants and the Commissioner are barred from re-litigating issues that have been previously determined at

-12-

the administrative level.  *Id*. at 842.  *Drummond* requires that absent evidence a

claimant's condition has improved, findings issued by an ALJ as part of a prior disability

determination are binding upon an ALJ in a subsequent hearing.  *Id*. at 841 (citing 20

C.F.R. § 404.905).  The Commissioner bears the burden of proving changed

circumstances so as to escape being bound by the principles of *res judicata*.  *Id*. at 843.  If

an ALJ's departure from the findings of a prior ALJ is supported by substantial evidence,

this Court will affirm.  *Id*.

The decision in *Drummond* led to the Commissioner's issuance of an

Acquiescence Ruling mandating that ALJs in all states within the Sixth Circuit apply *res*

*judicata* to a prior ALJs assessment of a claimant's RFC and other findings made as part

of a sequential evaluation.  The Acquiescence Ruling dictates:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as a prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law. . .

AR 98-4(6), 1998 WL 283902, at 3 (June 1, 1998).

The record does not support a finding that Plaintiff's condition has improved

sufficiently to warrant an increased RFC.  The ALJ's determination that the Plaintiff is

capable of medium work seems to rest upon the 2009 lumbar MRI and her determination

that the Plaintiff has sought "only conservative pain management."  (Tr. 20).  The ALJ

-13-

also cites a vague "improvement in [Plaintiff's] overall condition," but does not point to any additional evidence to support this improvement. *Id*.

The 2009 lumbar MRI upon which the ALJ relies describes "mild disc bulging [at] L4-L5 and L5-S1 without definite root impingement" and "mild degenerative changes." (Tr. 398, 394). This report notes that the L5-S1 disc bulging is "contacting but not definitely impinging the S1 roots." (Tr. 398). The 2000 lumbar MRI upon which the prior ALJ relied describes "mild disc bulging at L4-L5 with no significant neural foraminal impingement," as well as a bulging disc at L5-S1 with "slight impingement upon the neural foramina" and "mild degenerative changes." (Tr. 457, 456).

The only discernable difference between these two reports is that the 2000 MRI describes L5-S1 disc bulging which slightly impinges the S1 nerves, whereas the 2009 MRI describes L5-S1 disc bulging which contacts, and may, but does not *definitively* impinge the S1 nerves. (Tr. 398, 457). Accordingly, the two MRIs differ only as to their degree of certainty regarding nerve impingement, but do not necessarily disagree as to whether such impingement may be present. It is therefore unreasonable to conclude that the 2009 lumbar MRI materially differs from the 2000 lumbar MRI.

In regard to the Plaintiff's pain management, there is nothing in the record which indicates his treatment is any more conservative now than it was at the time of the 2005 ALJ decision. The record is replete with treatment notes from Dr. Reddy, Plaintiff's pain management doctor, which document the physical therapy and pharmaceutical pain

-14-

management techniques used by the doctor to treat Plaintiff.  (Tr. 298-335, 340-345, 347-357, 399-450).  There is no evidence which suggests that the Plaintiff's current pain management differs materially from his pain management at the time of the previous ALJ decision.

The ALJ's assertion regarding Plaintiff's improved "overall physical condition" is also not supported by the evidence.  (Tr. 20).  The ALJ does not specify any evidence on which this perceived improvement is based; rather, she provides the conclusion that his condition has improved while providing nothing in the way of analysis or reasoning.  *Id*.

A similar circumstance exists regarding the ALJ's treatment of Plaintiff's cervical disc displacement.  *Id*.  It is impossible to discern how much importance the ALJ accorded to the presence or absence of this prior impairment because she never mentions it again.  *Id*.  The ALJ's finding that the impairment no longer exists is implied by virtue of her failure to enumerate it as one of Plaintiff's current impairments, however there is no specific explanation as to how this determination was made, or what impact it may have on the Plaintiff's RFC.  There is no feasible basis on which to evaluate the ALJ's reasoning for her unarticulated determination regarding Plaintiff's cervical disc displacement without such an explanation.

Medium work involves lifting no more than 50 pounds at a time, with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. 404.1567(c).  There is no evidence or testimony that offers a basis for the determination that Plaintiff is now

-15-

able to perform this type of exertion, despite an earlier finding that he could not.  To the contrary, the only new and material evidence which might justify a departure from the previous ALJ's findings suggests that the Plaintiff's capabilities have actually *diminished*. Dr. Reddy's March 30, 2010 physical assessment indicates that Plaintiff is capable of lifting only 5 pounds occasionally, and 2 pounds frequently.  (Tr. 452).  Therefore, the ALJ's finding that Plaintiff is now capable of performing medium work is entirely unsupported by the evidence and conflicts with the *Drummond* ruling.

## C.

Next, Plaintiff alleges that the ALJ fails to apply the correct legal framework to the opinions of the Plaintiff's treating physicians. Generally, an ALJ must give greater deference to the opinions of treating physicians rather than the opinions of non-treating physicians.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  Social Security Administration Regulations require that an ALJ give the opinion of a treating physician controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), *citing* 20 C.F.R. § 404.1527(d)(2).  This deference is a product of the agency regulations' recognition that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments. . ."  20 C.F.R. § 404.1527(d)(2).

Even if the opinion of a treating source is not given controlling weight, it may still be granted some measure of deference, and must be analyzed by the ALJ. *Rogers*, 486 F.3d at 242. The regulations require that the ALJ's analysis include consideration of the nature and length of the treatment relationship, the frequency of examination, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the source's specialization. 20 C.F.R. § 404.1527(d)(2). The ALJ is not required to provide "an exhaustive factor-by-factor" analysis when weighing an opinion. *Francis v. Comm'r of Soc. Sec.*, No. 09-6263 2011 WL 915719, at 3 (6th Cir. Mar. 16, 2011). However, the regulations require that the ALJ provide "good reasons" for the weight given to treating source opinions. 20 C.F.R. § 404.1527(d)(2).

The record contains Dr. Reddy's treatment notes from Plaintiff's visits to the Dayton Pain Center from January of 2007 to March of 2010. (Tr. 298-335, 340-358, 399-450). During this period, Plaintiff visited the Dayton Pain Center approximately once per month. The record also contains a physical assessment performed by Dr. Reddy on March 30, 2010. (Tr. 451-455). In this assessment, Dr. Reddy opined that Plaintiff was incapable of even sedentary work due to a number of enumerated limitations based upon the his history, the results of a physical exam, an MRI of the lumbar spine, and an x-ray of the lower left extremity. (Tr. 451). Dr. Reddy opined that Plaintiff could never climb, balance, crouch, kneel, or crawl, and that he could only occasionally stoop. (Tr. 453).

-17-

Dr. Reddy also found that Plaintiff was capable of lifting a maximum of 5 pounds occasionally, and only 2 pounds frequently.  (Tr. 452).

The ALJ gives the opinions of Dr. Reddy little weight, "based primarily on the minimal objective findings."  (Tr. 21).  The ALJ specifically cites the 2009 lumbar MRI results and x-rays of the lower extremity as evidence to support this conclusion.  *Id*. However, the most immediate problem is that Dr. Reddy expressly based his opinion, in part, on the very same MRI results used by the ALJ to reach her opinion.  Dr. Reddy is a medical doctor, and his informed opinion of MRI results has greater evidentiary value than the lay reading of those same results by the ALJ.  It is unreasonable for the ALJ to disregard the findings of a medical professional by contradicting his medical opinion with her own, absent some other evidence.  *Hall v. Celebreeze*, 314 F.2d 686, 690 (6th Cir.1963) (An "ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record").

There is nothing in the record which indicates that Dr. Reddy's opinion is inconsistent with the record or unsupported by objective medical evidence.  The 2009 MRI results describe injuries to the lower back which could conceivably cause the Plaintiff's alleged symptoms, and it is therefore unreasonable to hold that the MRI report is inconsistent with medical testimony.  (Tr. 394, 398).  There are 106 pages of treatment notes, spanning more than three years, which consistently make note of Plaintiff's severe physical pain.  (Tr. 298-335, 340-358, 399-450).  These notes also specify clinical signs

and symptoms which support these findings, including Plaintiff's antalgic gait and abbreviated range of motion. *Id.* If the ALJ had provided some other reason for the lack of deference accorded to Dr. Reddy's opinion, this Court may have been able to identify some reasonable basis for her decision; but she did not. Dr. Reddy's opinion is that of a medical professional and treating source, is based upon a substantial number of consistent treatment notes spread over a significant period of time, as well as the his reading of the 2009 MRI, and identifies specific signs and symptoms which support his opinion. Therefore, the ALJ's decision to give little weight to Dr. Reddy's opinion is unreasonable and unsupported by the evidence.

The ALJ gives similar treatment to the opinions of treating sources Dr. Riley and Dr. Shoenfelt. (Tr. 21-22). The ALJ reasons that the opinion of Dr. Riley is entitled to little weight because of his "relatively infrequent" treatment of the Plaintiff, the prevalence of Plaintiff's discussion of pain and problems with his Worker's Compensation claim, and because GAF scores in the 50s are representative of moderate limitations, and thus inconsistent with Dr. Riley's opinion. (Tr. 21).

The frequency of Plaintiff's visits with his doctor are pertinent to the consideration of the nature and extent of the treatment relationship between Dr. Riley and Plaintiff. *See* 20 C.F.R. § 404.1527(d)(2)(ii) ("We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed . . ."). It is reasonable for the ALJ to conclude that visits which occur only once per month *may*

not support a finding of disability.  However, the ALJ ignores evidence in the form of psychometric testing conducted by Dr. Riley which revealed that Plaintiff would "probably be erratic in adhering to a treatment schedule," and that "cooperation may become a serious issue."  (Tr. 291).  The Sixth Circuit has recognized that the failure to seek adequate treatment can be a symptom of some mental disorders.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283.  Here, upon the whole record, Plaintiff's infrequent visits are most reasonably symptoms and evidence in *support* of a finding of mental illness, instead of a factor negating a finding of mental illness.

With respect to the substance of Plaintiff's conversations with his doctor, the ALJ alleges that Plaintiff's tendency to discuss his pain and Worker's Compensation case with Dr. Riley is somehow indicative of a lesser impairment. Such a conclusion is wholly unreasonable.  It is expected that when speaking with a counselor, a patient may focus specifically on the things which are bothering him most.  There is nothing suspicious about a man who claims to be in extreme pain discussing that pain with his psychiatrist. Likewise, the process of applying for and obtaining Worker's Compensation may very well have been stressful and difficult for Plaintiff, and thus within the scope of expected conversation between he and his doctor.  The ALJ's dubious "reasoning" in this regard is both unreasonable and unsupported by the record.

As for Plaintiff's GAF score of 52, the ALJ failed to fully consider the evidence. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)

-20-

draws the line between "serious" symptoms and "moderate" symptoms at a GAF score of 50. *DSM-IV* at 32. However, the DSM also instructs clinicians not to include impairment occasioned by physical limitations in their determination of a patient's GAF. *Id*. Dr. Riley specifically noted that Plaintiff's "thought content [was] intensely focused on intense chronic pain," and that his depression is closely tied to this pain. (Tr. 230, 263-265). Therefore, it is reasonable that Plaintiffs GAF scores would represent an overestimation of his functioning.

Additionally, while reaching his opinion that Plaintiff cannot "tolerate [workplace] stressors of any kind until pain levels decrease," Dr. Riley was undoubtedly aware of his own assessment of Plaintiff's GAF. (Tr. 231). Dr. Riley is a mental health professional, and thus it is unfathomable that he somehow overlooked *his own judgment* regarding Plaintiff's GAF, or otherwise misunderstood what the GAF is meant to represent. On the other hand, the ALJ is not a mental health professional and certainly possesses less expertise that Dr. Riley to interpret Plaintiff's GAF scores. Indeed, the ALJ's failure to fully comprehend the meaning of Dr. Riley's assessment of Plaintiff's GAF seems to be the result of the ALJ's refusal to accord Dr. Riley's opinion as a whole any significant value. The ALJ's reasons for disregarding Dr. Riley's treating source opinion essentially hinge on her contradictory interpretation of his own treatment notes and assessments. Therefore, the ALJ's decision to give Dr. Riley's opinion little weight is unreasonable and unsupported by the record.

The only significant difference between the ALJ's treatment of Dr. Riley's opinion and that of Dr. Shoenfelt is that in addition to a similar misinterpretation of GAF scores, the ALJ discredits the claims that Plaintiff is engaging in self-mutilating behavior, because the behavior is unsupported in the record. (Tr. 22). However, Plaintiff referenced this behavior during his hearing with the ALJ. (Tr. 45-47). Additionally, Plaintiff's treatment records also reference such behavior a number of times. (Tr. 392, 459-464, 477). The implication that Plaintiff's failure to discuss such behavior at an earlier time must somehow discredit his claim that the behavior does occur is without merit. Any number of reasons could explain why Plaintiff chose not to disclose such extreme behavior at an earlier date. The evidence as a whole simply does not justify the ALJ's accordance of little weight to the opinion of Dr. Shoenfelt. The ALJ's treatment of Dr. Shoenfelt's treating source opinion is unreasonable and unsupported by the evidence.

The ALJ's reasoning for her refusal to give controlling or significant weight to the opinions of Plaintiff's treating doctors is deficient. In each case, her lack of deference to Plaintiff's doctors stems from a conflict between the doctors' interpretation of medical evidence, and the ALJ's interpretation of the same evidence. As previously noted, the ALJ is simply not at liberty to substitute her own judgment for that of a physician without relying on some other objective evidence. *Hall v. Celebreeze*, 314 F.2d 686, 690 (6th Cir.1963). There is nothing in the way of substantial objective evidence to support the ALJ's conclusions, but there is considerable evidence to contradict them. For these

-22-

reasons, the ALJ accords improper treatment to the opinions of Plaintiff's treating physicians by failing to give them controlling or even significant weight.

## D.

Next, Plaintiff alleges that the ALJ improperly substitutes her own lay reading of a lumbar MRI report for the opinions of medical professionals and all the other medical evidence of record.  An ALJ may not substitute her own judgment for the opinions of physicians without relying on some other substantial evidence.  *Hall*, 314 F.2d at 690.

The Court considered this issue *supra* (Section C) and concluded that the ALJ gave inadequate weight to the opinions of Plaintiff's treating physicians.  The Court reiterates that reasoning here.  Accordingly, the ALJ erred by improperly substituting her opinions and interpretations for those of Plaintiff's physicians.

## E.

Next, Plaintiff alleges that the ALJ failed to account for his cervical degenerative disease.  The Sixth Circuit has held that "once a condition has been shown to exist, there is a presumption, in the absence of proof to the contrary, that it continues."  *Hall*, 314 F.2d at 688.[10]

The record contains the 2005 ALJ decision, which includes a finding that Plaintiff suffered from cervical disc disease, based on imaging and medical testimony.  (Tr. 67).

---

[10]  *See also*: *Richardson v. Heckler*, 750 F.2d 506, 510 (6th Cir. 1984) ("[t]his evidence [of a disability] triggered the presumption of continuing disability and placed the burden on the Secretary to produce evidence that [Plaintiff's] condition has improved").

Because the ALJ's 2005 findings are binding upon the current ALJ absent new and material evidence, she must at least be aware of what those findings were before she can conceivably determine whether they are still warranted.  *See Drummond*, 126 F.3d at 842. Indeed, the ALJ's decision includes two specific references to the 2005 finding that one of Plaintiff's severe impairments was cervical degenerative disc disease.  (Tr. 16, 20). Thus, absent new and material evidence that the condition has changed, there is a presumption that Plaintiff continues to suffer from cervical disc disease.  *Hall*, 314 F.2d at 688.  The ALJ fails to consider the cervical disc disease among Plaintiff's severe impairments, but provides no reasoning for this change.  Besides noting that "the prior record indicated that the claimant had minimal cervical disc displacement," there is not a single mention of the impairment in her decision.

The ALJ's inexplicable failure to provide any analysis of the impairment precludes this Court from finding that her decision was supported by substantial evidence.  The record simply does not provide any new or material evidence which might suggest that Plaintiff's cervical disc disease has improved.  To the contrary, the record contains numerous references to Plaintiff's neck pain.  (Tr. 40, 44-45, 342-343, 402-430, 434-442).  For these reasons, the ALJ's failure to account for Plaintiff's cervical disc condition is improper.

-24-

**F.**

Next, Plaintiff alleges that the ALJ's limitation to simple, routine tasks fails to account for his severe mental impairments. This Court previously determined that the ALJ's finding regarding medium work was unsupported by the evidence and in conflict with the *Drummond* ruling. Because this Court rejects the ALJ's contention that Plaintiff is capable of medium work, it must also reject the additional, related finding that a limitation to simple, routine tasks properly accounts for his impairments. Accordingly, the ALJ's limitation to simple, routine tasks is unsupported by substantial evidence.

**G.**

Finally, Plaintiff alleges that the ALJ's decision is not supported by substantial evidence, and that the Commissioner's position is unjustified. The Court agrees. The foundation upon which the ALJ has constructed her decision consists of her inadequate, sometimes altogether absent, analysis, as well as her unreasonable interpretations of medical testimony, imaging, and reports. These interpretations not only directly conflict with the opinions of Plaintiff's treating medical professionals at every turn, but, in the same breath, turn to those very same opinions for support of her conclusions regarding the inconsistency *of those opinions*.

This "analysis" defies logic and creates conflicts in the record that simply do not exist. The ALJ's repeated, faulty interpretations of medical and psychological data, and her disregard for the opinions of *three* different doctors, simply falls short of the

-25-

*substantial evidence* required to support her decision.  The ALJ's analysis rarely directs the Court to any evidence, and sometimes overlooks entire impairments.  When the ALJ's analysis does point to evidence in support of a conclusion, that evidence has invariably been misinterpreted or misconstrued, and actually indicates support for an opposite conclusion.  Therefore, the proof of disability is strong and opposing evidence is lacking in substance.  A remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful purpose.  *Felisky v. Bowen,* 35 F.3d 1027, 1041 (6th Cir. 1994).

## III.

When, as here, the non-disability determination is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted.  The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987).

The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.  *Faucher*, 17 F.3d at 176; *see also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 772 F.2d 966, 973 (6th Cir. 1985).  In its determination regarding the relative weight of the evidence, the Court must consider the record as a whole, and "must take into account whatever in the record fairly detracts from its weight."  *Richardson v. Heckler*, 750 F.2d 506.

The record taken as a whole reveals that proof of disability is strong, while opposing evidence is lacking in substance; a remand would serve no purpose other than to delay.  As fully described herein, considering the extensive record of medical evidence, the credible and controlling findings and opinions of treating physicians, the absence of proper analysis on the part of the ALJ, and the lack of substantial evidence to support her conclusions, proof of disability is strong and opposing evidence is lacking in substance.

### IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner, that Plaintiff was not entitled to disability insurance benefits and supplemental security income beginning July 30, 2005, is hereby found to be **NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**, and it is **REVERSED**; and this matter is **REMANDED** to the ALJ for an immediate award of benefits.

Date:  8/30/12                               *s/ Timothy S. Black*
                                             Timothy S. Black
                                             United States District Judge